IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CR. NO. SA-13-CR-00089-DAE |
| | ) | |
| vs. | ) | |
| | ) | |
| GILBERT GUZMAN et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS</u>

On August 1, 2013, the Court heard Defendant James Lopez's Motion to Suppress Tangible Evidence (doc. # 68) and Defendant Serafin Villenueva's Motion to Suppress Tangible Evidence (doc. # 71). Assistant United States Attorney David Shearer, Esq. appeared at the hearing on behalf of the United States ("the Government"); Michael J. Morris, Esq., appeared at the hearing on behalf of Defendant James Lopez ("Lopez"), and John A. Convery, Esq. appeared at the hearing on behalf of Defendant Serafin Villanueva ("Villanueva"). After reviewing the Motions and the supporting and opposing memoranda, the Court **DENIES** both Motions to Suppress (docs. ## 68, 71).

## BACKGROUND

According to the affidavit supporting the criminal complaint filed in this case, in late 2012, San Antonio Police Department ("SAPD") Gang Unit detectives commenced an investigation of a suspected methamphetamine distribution operation run by members of a gang known as Hermanos Pistoleros, or HPL.  (Id.)  The investigation included surveillance of a business known as A-1 Kustom, a custom paint and auto body shop.  (Doc. # 1.)  On January 28, 2013, SAPD detectives followed Defendants Gilbert Guzman ("Guzman") and Felisha Salinas ("Salinas") when they left A-1 Kustom in a black Dodge Challenger.  (Id.) Detectives followed Guzman and Salinas to a Wal-Mart, where they observed Guzman engage in what appeared to be a drug transaction with an individual driving a black Volvo.  (Id.)  After the two cars parted ways, uniformed officers stopped the Volvo and searched the passenger, Villanueva, who was found to be in possession of approximately 8 grams of methamphetamine.  (Id.)  Uniformed officers also stopped the Dodge Challenger and found approximately 5 grams of methamphetamine in Guzman's pocket, and approximately 50 grams of methamphetamine concealed under Salinas's clothes.  (Id.)  Guzman, Salinas, Lopez and Villanueva were all arrested and brought to the SAPD Gang Unit office to be interviewed.  (Id.)

2

On February 6, 2013, an Indictment was filed charging Guzman, Salinas, Lopez and Villanueva with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).  (Doc. # 24.)  Lopez and Villanueva filed the instant Motions to Suppress on June 25, 2013 and June 27, 2013, respectively.  (Docs. ## 68, 71.)  Defendants contend that law enforcement had neither probable cause nor reasonable suspicion to stop the Volvo and search Villanueva's person, and that the methamphetamine found on Villanueva's person must therefore be suppressed.

At the evidentiary hearing on August 1, 2013, the Government called four witnesses, all members of the SAPD: Sergeant Valente Garcia; Officer Marco Garza; Officer Wintric Ellis; and Detective Mark Clancy.  The Defendants called one witness: Alessandra Vigil, an investigator.  The witnesses testified as follows.

I.    Sergeant Garcia

Sergeant Valente Garcia ("Garcia") has been a member of the SAPD Gang Unit for 20 years and led the investigation that resulted in Lopez and Villanueva's arrests.  At the end of September 2012, Garcia and detectives working under him began surveilling A-1 Kustom.  As the investigation progressed, Garcia cultivated several sources—people who were caught with drugs and agreed to provide the Gang Unit detectives with information.  The first cooperating source ("CS-1") told detectives that Andres Sanchez ("Sanchez") was

the leader of a methamphetamine distribution ring, Guzman was his partner, and they operated out of A-1 Kustom.  Another cooperating source ("CS-2") gave detectives the same information.  Both CS-1 and CS-2 identified Villanueva, and told detectives that he worked for Sanchez, was at A-1 Kustom regularly, was an active member of HPL, and acted as Sanchez's main "runner" when orders were placed.  The cooperating sources also described someone who resembled Lopez.

On cross-examination, Garcia testified that CS-1 was detained while in possession of marijuana and has a criminal history, but was released without being charged with a crime.  He admitted that CS-1 did not identify Villanueva by name, but rather identified a photograph of Villanueva as "Smokey," his gang name, and indicated that Smokey picked up and delivered drugs in a black Volvo. Garcia testified that CS-1 was stopped and gave detectives information about Villanueva within one month of January 28, 2013.  CS-2 was also stopped within one month of January 28, 2013, and also identified a photograph of Villanueva as Smokey and told detectives that Smokey acted as a runner for Sanchez.

Garcia attempted to corroborate the information provided by CS-1 and CS-2 by engaging in computer research and periodically surveilling the shop. Garcia and his detectives observed Sanchez, Villanueva, and several other individuals at the shop.  They also observed what appeared to be narcotics transactions, and seized narcotics from people leaving the shop, including from

4

Sanchez himself, who was stopped leaving A-1 Kustom and found to be in possession of methamphetamine.

On January 28, 2013, detectives received information that there were going to be drug deals at A-1 Kustom and possibly at another location. Detectives established surveillance, and observed Guzman at the shop. They saw several people arrive and leave, and conducted traffic stops of vehicles leaving the shop. On cross-examination, Garcia testified that 7 people were stopped leaving the shop on January 28, 2013, and 5 of them were found to be in possession of methamphetamine. The 5 stopped with narcotics on them told law enforcement that they got their methamphetamine from the shop—specifically, from Guzman. One told officers that he had previously obtained drugs from Smokey, but not at the shop.

When Guzman left A-1 Kustom on January 28, 2013, detectives followed him to a residence. On cross-examination, Garcia acknowledged that Guzman was inside the house long enough to conduct a drug transaction, but was not stopped by officers then. After leaving the residence, Guzman drove to a Wal-Mart on Military Drive. Sergeant Garcia was at the Wal-Mart, coordinating and participating in the surveillance. All members of his team were communicating by radio. At the Wal-Mart, Guzman drove around as if looking for someone, then went to the gas pumps. Guzman's female passenger exited the car and began

5

pumping gas.  A black Volvo pulled up one pump away from Guzman's pump, and the driver—later identified as Lopez—exited the car and approached Guzman.  A transaction appeared to take place between Lopez and Guzman; property changed hands.  The two also shook hands.

During Garcia's cross-examination, defense counsel played footage from a security camera located at the Wal-Mart fuel pumps.  A series of still images showed Salinas exit Guzman's vehicle and begin pumping gas.  Guzman exited the vehicle as well.  The black Volvo pulled up at the next pump, and Lopez exited and approached Guzman.  The two appeared to interact for a few minutes.  Both walked to the black Volvo and stood there briefly.  Then Guzman returned to his car, Lopez entered the black Volvo, and both vehicles drove away.

On cross-examination, Garcia admitted that he did not see anything that looked like a hand-to-hand transaction; he saw only what appeared to be a handshake between Guzman and Lopez.  However, another detective watching from a different vantage point said, over the radio, that he saw a hand-to-hand transaction between Guzman and Lopez.  Garcia does not recall which of the 10 detectives in the Wal-Mart parking lot that night said he saw the hand-to-hand transaction, but Garcia had worked with all of them for at least 3 years, and considered the statement trustworthy.  Garcia also testified that the amount of

methamphetamine seized from Guzman and Salinas was the size of a golf ball, and could have been passed to Guzman in what looked like a handshake.

After Lopez and Guzman shook hands, Guzman briefly approached the black Volvo, then returned to his own car and drove away from the pumps.  At that point, the detectives ran the plate number on the black Volvo, and discovered that it was Sanchez's car.  Detectives had previously been told that Sanchez's black Volvo was used to transport and deliver narcotics.  On cross-examination, Garcia acknowledged that neither he nor any of the other detectives knew who Lopez was at that point, and none of them knew Villanueva was in the passenger seat.  The Volvo left the gas pumps, but did not leave the parking lot—it circled around and parked at the front of the store.  Garcia directed two uniformed officers (Officers Marco Garza and Wintric Ellis) to make contact with the Volvo.  Officers Garza and Ellis pulled their car behind Lopez's, blocking the Volvo from pulling out.  When the squad car pulled in behind the Volvo, Villanueva exited the passenger side.  It appeared that Villanueva was going to run, and Garcia saw Villanueva stick his hand in his pocket.  He was searched, and methamphetamine was found in his pocket.  Villanueva, Lopez, Guzman, and Salinas were all brought back to the Gang Unit and interviewed.

On cross-examination, Garcia testified that he ordered Officers Garza and Ellis to stop Lopez's car based on: (1) the fact that he had been told there

would be a drug transaction away from A-1 Kustom that day; (2) the fact that the black Volvo was registered to Sanchez; and (3) the hand-to-hand transaction.

## II.    Officer Garza

Officer Marco Garza ("Garza") has been with the SAPD for 19 years, and is assigned to the Gang Unit.  On January 28, 2013 he was wearing a full SAPD uniform.  He and Officer Ellis were parked at a business nearby and were communicating by radio with the detectives conducting surveillance at the Wal-Mart.  Garza and Ellis heard that there had been a hand-to-hand transaction, and then heard a request for a uniformed officer to come make a stop.  They drove to Wal-Mart and pulled up behind the black Volvo just as it pulled into a parking spot.  Garza opened his door at the exact same time that the passenger—Villanueva—opened his door.  Villanueva began walking toward the Wal-Mart.  Garza called to him to stop at least three times before Villanueva complied.  Villanueva's hands were in his pockets, which Garza considered a safety issue, so he ordered Villanueva to remove his hands from his pockets.  When Villanueva did so, Garza saw the tip of a plastic baggie sticking out of Villanueva's pocket, and he pulled it out.  It contained methamphetamine.

## III.    Officer Ellis

Officer Wintric Ellis ("Ellis") has been with the SAPD for 9 years. He is Officer Garza's partner and was with Garza on January 28, 2013.  When they

8

parked behind the black Volvo, Ellis approached the Volvo and asked Lopez to get out of the car.  He detained Lopez while they waited for detectives to arrive.  Ellis testified that he stopped Lopez's car based on the detectives' direction to do so, and did not have any independent knowledge that gave him probable cause to arrest Lopez and Villanueva.

IV.    Detective Clancy

Detective Mark Clancy ("Clancy") has been with the SAPD for 24 years, and was a patrol officer for about 19.  He was monitoring surveillance and listening to the police radio on January 28, 2013, but was not in the Wal-Mart parking lot.  He recalls a detective broadcasting over the radio that a hand-to-hand transaction occurred when Lopez approached Guzman's car, while Salinas was pumping gas.  After the hand-to-hand transaction occurred, Lopez and Guzman shook hands.  Clancy does not recall which detective saw the hand-to-hand transaction.  On cross-examination, Clancy testified that Villanueva was known to law enforcement only as Smokey until his arrest.

V.    Alessandra Vigil

Alessandra Vigil works for Defendant Lopez's attorney.  She testified that the security camera at the Wal-Mart fuel pumps is 27 feet from the pump that Guzman's car was stopped at.

9

DISCUSSION

Defendants argue that the search of Villanueva's person violated the Fourth Amendment, and that the methamphetamine seized pursuant to that search must therefore be suppressed. The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Warrantless searches and seizures, "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).

The Supreme Court has recognized an exception for searches incident to arrest. Following a lawful custodial arrest, an officer may conduct a search of a suspect's person and the areas within his immediate control. See Smith v. Ohio, 494 U.S. 541, 543 (1990). A warrantless search incident to arrest is justified by "the need to disarm the suspect in order to take him into custody" and by "the need to preserve evidence on [the suspect's] person for later use at trial." United States v. Robinson, 414 U.S. 218, 234 (1973); see also Virginia v. Moore, 553 U.S. 164, 176 (2008) (recognizing that officers "may perform searches incident to

10

constitutionally permissible arrests in order to ensure their safety and safeguard evidence").

In this case, the arresting officers did not have a warrant for Villanueva's arrest.  However, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).  Accordingly, if the officers had probable cause to arrest Villanueva, then the seizure of his person constituted a lawful custodial arrest, and the officers were justified in searching his person and seizing the methamphetamine found in his pocket.  Probable cause exists if, at the moment the arrest is made, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."  Beck v. State of Ohio, 379 U.S. 89, 91 (1964).  "[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists," Ornelas v. United States, 517 U.S. 690, 700 (1996), including inferences that "might well elude an untrained person," United States v. Cortez, 449 U.S. 411, 418 (1981).

The Government maintains that it had probable cause to arrest Villanueva based on the tip that Guzman would be engaging in a drug transaction

11

away from A-1 Kustom; the fact that detectives witnessed a hand-to-hand transaction between Guzman and the driver of the black Volvo; the fact that the black Volvo was linked to drug transactions; and Villanueva's conduct when ordered to stop by Officer Garza.  The Court agrees that the officers had probable cause to arrest Villanueva.

       First, "in making a warrantless arrest an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'"  <u>Illinois v. Gates</u>, 462 U.S. 213, 242 (1983) (quoting <u>Jones v. United States</u>, 362 U.S. 257, 269 (1983)).  In this case, Sergeant Garcia and his team received information that there were going to be drug transactions at A-1 Kustom and possibly at another location on January 28, 2013.  Detectives established surveillance at A-1 Kustom, observed Guzman at the shop, and saw several people arrive and depart.  Seven people were stopped leaving the shop that day, and 5 were found to be in possession of methamphetamine, which they told detectives they got from Guzman at A-1 Kustom.  Thus, independent investigation corroborated the informant's statement that a number of transactions were going to take place at A-1 Kustom that day.  That being so, the detectives were entitled to rely upon the informant's statement that a drug transaction was also going to take place away from A-1 Kustom.  <u>See</u>

Draper v. United States, 358 U.S. 307, 313 (1959) (holding that "with every other bit of [the informant's] information being thus personally verified," it was reasonable for the officer "to believe that the remaining unverified bit of [the informant's] information—that [the suspect] would have the heroin with him—was likewise true").

Second, a detective observed conduct consistent with an exchange of drugs for money—a hand-to-hand transaction—between Guzman and Lopez. Several courts have found that an experienced police officer's observation of a hand-to-hand exchange or transaction supports a finding of probable cause.  In State v. Moore, 181 N.J. 40, 46–47 (2004), the New Jersey Supreme Court held the totality of the circumstances supported probable cause where an "experienced narcotics officer," who had made "numerous drug arrests in the same neighborhood"—a heavy drug trafficking area—saw an individual and his companion give money to a third person in exchange for small unknown objects. Similarly, in State v. Castro, 891 A.2d 848, 854 (R.I. 2006), the Rhode Island Supreme Court held that an officer had probable cause to arrest where he "observed a very brief transaction," which, based on "his extensive training and experience in narcotics crimes and the high-crime area he was surveilling . . . he believed to be an exchange of possible drugs for currency."  The Second Circuit has held that an officer had probable cause to arrest where he observed the

defendant on four separate occasions "touch hands" with another individual, enter the vestibule of a building with that person, and then quickly exit, in an area "known to have significant narcotics activity."  Morales v. Greiner, 381 F.3d 47, 47–48 (2d Cir. 2004) (per curiam); see also Smith v. Tobon, --- F. App'x ---, 2013 WL 3368885, at *2 (2d Cir. Jul, 8, 2013) (probable cause to arrest defendant where officer saw him engaged "in what appeared to be a hand-to-hand exchange of drugs for money in an area where there had been several recent drug arrests").

Defendants point out that other courts have reached the opposite conclusion.  The Colorado Supreme Court held that an officer did not have probable cause to arrest an individual based on "a brief exchange of some object or objects outside a bar."  People v. Ratliff, 778 P.2d 1371, 1377–78 (Colo. 1989). Similarly, in Commonwealth v. Dunlap, 596 Pa. 147, 150–51 (2007), cert. denied, 555 U.S. 964 (2008), the Pennsylvania Supreme Court held that the officer did not have probable cause to arrest where he observed an individual engage in a brief conversation with another man, hand him money, and in turn receive "small objects."  And in Shelton v. United States, 929 A.2d 420, 424 (D.C. 2007), the District of Columbia Court of Appeals held that probable cause did not exist where the officer saw an individual sitting in his car in a convenience store parking lot, watched a pedestrian approach and give the individual money, and saw the pedestrian receive a "small object" in return.

14

The cases in this latter category are all distinguishable from the case at hand.  In each of those cases, the court noted that a hand-to-hand transaction was the only evidence that a crime had been committed, and indicated that, if other factors suggestive of criminal activity were present, it may have found that probable cause existed.  For example, in Ratliff the court noted that the officers did not have "any prior information that either the defendant or [the person he was believed to have made an exchange with] would be engaging in a drug transaction at the time and place in question."  778 F.2d at 1377–78.  In Dunlap, the court observed that the officer had no "prior reason to expect that [the individual] was involved in drug activity or was tipped off by an informant that a drug transaction was set to occur," and "observed nothing that he could identify as narcotics."  596 Pa. at 159.  And in Shelton, the court noted that the record was "otherwise devoid of suspicious circumstances," and observed that in "many other two-way transaction cases" it had "relied on additional contextual factors to support a finding of probable cause."  929 A.2d at 425.  In this case, officers knew that Guzman was involved in drug activity, and had received information that Guzman would be engaging in a drug transaction that very night.  While the hand-to-hand transaction in isolation might have been susceptible to an innocent explanation, coupled with other "contextual factors," it supported a finding of probable cause.

15

Third, the detectives knew that the person Guzman met at the Wal-Mart fuel pumps on January 28, 2013 was driving Sanchez's black Volvo, a car that the police had been told was used to pick up and deliver drugs. Armed with the knowledge that a drug transaction was going to take place, and having seen what appeared to be a hand-to-hand exchange of some sort, the officers were warranted in concluding that the exchange was not innocuous when they discovered that the vehicle belonged to Sanchez, the leader of the drug ring, and had been used to facilitate drug transactions in the past.

Defendants point out that probable cause must be particularized with respect to the person to be searched or seized, and argue that, even if there existed probable cause to arrest Lopez, the officers did not have probable cause to arrest Villanueva. At the hearing, defense counsel argued that the facts in this case are analogous to those presented in Ybarra v. Illinois, 444 U.S. 85 (1979). In Ybarra, police received information that a bartender was selling heroin, and obtained a warrant to search the bar. Id. at 87. Ybarra was present when the police arrived to execute the warrant, and one of the officers searched him and found heroin in his pocket. Id. at 88–89. The Supreme Court noted that the police had no reason to believe Ybarra had committed or was committing any crime, and knew nothing about him except that he was "present . . . in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." Id. at

16

91.  The Court observed that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," and held that the search and seizure violated the Fourth and Fourteenth Amendments.  Id.

The Court does not agree that this case is analogous to Ybarra.  In that case, the defendant was one of many customers present in a public place; here, Villanueva was the sole passenger in a private automobile.  The Supreme Court has held that officers have probable cause to arrest a passenger of a car in which drugs and money are found, noting that "a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing."  Wyoming v. Houghton, 526 U.S. 295, 304–05 (1999).  "[I]t [is] reasonable for the officer to infer a common enterprise" among individuals in a car where the facts "indicate[] the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him."  Maryland v. Pringle, 540 U.S. 366, 373 (2003).  Furthermore, when Officers Garza and Ellis pulled up behind the black Volvo, Villanueva exited the vehicle and began walking toward the Wal-Mart—although he could not have failed to see the officers; the police car was blocking the Volvo in—and did not stop until Garza ordered him to do so three times.  See United States v. Wadley, 59 F.3d 510, 512 (5th Cir. 1995)

17

("Standing alone, a suspect's attempt to walk away or flee from a police officer is generally not sufficient to create probable cause," but "in combination with other facts and circumstances, flight from an officer may create probable cause where the defendant persistently attempts to evade capture.").

"Probable cause is determined by examining the totality of the circumstances." United States v. Fields, 456 F.3d 519, 523 (5th Cir. 2006).  Here, detectives received information from a confidential source that Guzman was going to engage in drug transactions at A-1 Kustom and at another location.  They watched A-1 Kustom and confirmed that a number of drug transactions did, in fact, take place.  Detectives followed Guzman, and saw him engage in what their experience led them to believe was a hand-to-hand transaction with the driver of a black Volvo.  They ran the Volvo's plates, and discovered that it was a car belonging to Sanchez, which they had reason to believe had been used to deliver drugs in the past.  When uniformed officers pulled up behind the black Volvo, Villanueva exited the car and began walking away.  While any one of these factors, standing alone, might not have been enough to establish probable cause to arrest Villanueva, together they were sufficient.  See United States v. Cavazos, 288 F.3d 706, 711 (5th Cir. 2002) (finding probable cause based on an informant's tip and suspicious behavior).  Accordingly, Villanueva's Motion to Suppress fails, as the

18

officers' seizure of his person constituted a lawful custodial arrest, and the

subsequent search was a lawful search incident to arrest.

Lopez's motion fails as well, not because the search of Villanueva's

person was constitutional, but because Lopez does not have standing to challenge

the search.   "Fourth Amendment rights are personal rights, which may be enforced

only by the person whose rights were infringed."  United States v. Pack, 612 F.3d

341, 347 (5th Cir. 2010).  Accordingly, "[i]n general, a person who is aggrieved by

an illegal search and seizure only through the introduction of damaging evidence

secured by a search of a third person's premises or property has not had any of his

Fourth Amendment rights infringed."  United States v. Wilson, 36 F.3d 1298, 1302

(5th Cir. 1994).  An individual may only challenge an illegal search if he had a

"'legitimate expectation of privacy' in the area searched."  Rawlings v. Kentucky,

448 U.S. 98, 104 (1980).  Lopez did not have a legitimate expectation of privacy in

Villanevua's person.  See Rawlings, 448 U.S. at 104–05 (petitioner did not have

legitimate expectation of privacy in third party's purse, where he had only known

the third party for a few days, he had never sought or received access to the purse,

and had no right to exclude other persons from the purse).  If the seizure of the

black Volvo had itself been unlawful, Lopez would have standing to move to

suppress evidence obtained as a result of that illegal seizure.  See Brendlin v.

California, 551 U.S. 249, 251 (2007) (holding that when police stop a vehicle,

19

everyone in the car is seized for  Fourth Amendment purposes, and thus both

passengers and drivers may challenge the stop's constitutionality).  However, the

seizure was not unlawful; the detectives had probable cause to believe the

individuals in the car had committed a crime.

<u>CONCLUSION</u>

For the reasons stated above, the Court **DENIES** Defendants' Motions

to Suppress.  (Docs. ## 68, 71.)

IT IS SO ORDERED.

DATED:  San Antonio, Texas, August 13, 2013.

_____
David Alan Ezra
Senior United States District Judge

20